1
2
3
4
5
6
7
8                 UNITED STATES DISTRICT COURT
9                 CENTRAL DISTRICT OF CALIFORNIA
10
11   NORRIS KAYE LEWIS,                 )    Case No. CV 08-3823-JTL
                                        )
12              Plaintiff,              )    MEMORANDUM OPINION AND ORDER
                                        )
13        v.                            )
                                        )
14   MICHAEL J. ASTRUE,                 )
     Commissioner of Social Security,   )
15                                      )
                Defendant.              )
16   _____)

17                          **PROCEEDINGS**

18        On June 19, 2008, Norris Kaye Lewis ("plaintiff") filed a Complaint seeking review of the

19   Social Security Administration's denial of her applications for Supplemental Security Income

20   benefits and Disability Insurance Benefits.  On July 8, 2008, plaintiff filed a Consent to Proceed

21   Before United States Magistrate Judge Jennifer T. Lum.  On August 10, 2008, Michael J.

22   Astrue, Commissioner of Social Security ("defendant"), filed a Consent to Proceed Before

23   United States Magistrate Judge Jennifer T. Lum.  Thereafter, on January 5, 2009, defendant

24   filed an Answer to the Complaint.  On March 18, 2009, the parties filed their Joint Stipulation.

25        The matter is now ready for decision.

26   ///

27   ///

28   ///

**BACKGROUND**

On July 28, 2006, plaintiff protectively filed applications for Disability Insurance Benefits and Supplemental Security Income benefits alleging an onset date of January 15, 2005, due to seizures, back pain, and high blood pressure.  (See Administrative Record ["AR"] at 52, 92-94, 95-99, 112).  The Commissioner denied plaintiff's applications for benefits initially on November 1, 2006.  (AR at 50-53).  Thereafter, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR at 59).

On December 4, 2007, the ALJ conducted a hearing in Los Angeles, California.  (See AR at 22-49).  Plaintiff appeared at the hearing with counsel and testified.  (AR at 24, 30-44).  A medical expert, Harvey Alprin, M.D., and a vocational expert, Heidi Paul, also testified at the hearing.  (AR at 25-29, 44-48).  On January 11, 2008, the ALJ issued a decision denying benefits to plaintiff.  (AR at 13-19).  In his decision, the ALJ determined that plaintiff had the following severe impairments: headaches, neck pain, and a history of seizure disorder and urinary incontinence and hypertension.  (AR at 16).  The ALJ determined that plaintiff did not have a medically determinable mental impairment that caused more than minimal limitations.  (Id.).  The ALJ also determined that plaintiff did not have an impairment or combination of impairments that meet or equal the criteria contained in the Commissioner's Listing of Impairments, 20 C.F.R. Section 404, Subpart P, Appendix 1.  (Id.).  The ALJ then concluded that plaintiff retained the residual functional capacity to perform medium work,[1] including her past relevant work as an office clerk routine, change person, income tax preparer, fast food worker, attendance clerk, and a general office clerk.  (AR at 16-17, 18-19).  Accordingly, the ALJ concluded that plaintiff was not disabled from January 15, 2005, the alleged disability onset date, through the date of his decision.  (AR at 13, 19).  The Appeals Council denied plaintiff's timely request for review of the ALJ's decision.  (See AR at 6, 9).

Thereafter, plaintiff appealed to the United States District Court.

---

[1]  Specifically, the ALJ found that plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, and could sit, stand, and walk for six hours in an eight-hour day, but could not perform any overhead reaching bilaterally and should avoid hazards such as heights and machinery.  (AR at 16-17).

**PLAINTIFF'S CONTENTIONS**

Plaintiff makes the following claims:

1.      The ALJ failed to properly consider the consultative psychological evaluation.

2.      The ALJ failed to pose a complete hypothetical to the vocational expert.

3.      The ALJ failed to establish that plaintiff was capable of performing work as a change person, income tax preparer, fast food worker, attendance clerk and a general office clerk.

4.      The ALJ failed to properly consider the type, dosage, effectiveness, and side effects of plaintiff's medication.

**STANDARD OF REVIEW**

Under 42 U.S.C. Section 405(g), this Court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and whether the proper legal standards were applied.  DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence means "more than a mere scintilla" but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Saelee v. Chater, 94 F.3d 520, 521-22 (9th Cir. 1996).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, 402 U.S. at 401.  This Court must review the record as a whole and consider adverse as well as supporting evidence.  Morgan v. Comm'r, 169 F.3d 595, 599 (9th Cir. 1999).  Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).

**DISCUSSION**

**A.      The Sequential Evaluation**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or . . . can be expected to last for a continuous period of not

1 less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has

2 established a five-step sequential process to determine whether a claimant is disabled.  20

3 C.F.R. §§ 404.1520, 416.920.

4        The first step is to determine whether the claimant is presently engaging in substantial

5 gainful activity.  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  If the claimant is engaging

6 in substantial gainful activity, disability benefits will be denied.  Bowen v. Yuckert, 482 U.S. 137,

7 141 (1987).  Second, the ALJ must determine whether the claimant has a severe impairment.

8 Parra, 481 F.3d at 746.  Third, the ALJ must determine whether the impairment is listed, or

9 equivalent to an impairment listed, in Appendix I of the regulations.  Id.  If the impediment meets

10 or equals one of the listed impairments, the claimant is presumptively disabled.  Bowen, 482

11 U.S. at 141.  Fourth, the ALJ must determine whether the impairment prevents the claimant

12 from doing past relevant work.  Pinto v. Massanari, 249 F.3d 840, 844-45 (9th Cir. 2001).  If the

13 claimant cannot perform his or her past relevant work, the ALJ proceeds to the fifth step and

14 must determine whether the impairment prevents the claimant from performing any other

15 substantial gainful activity.  Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

16        The claimant bears the burden of proving steps one through four, consistent with the

17 general rule that at all times, the burden is on the claimant to establish his or her entitlement

18 to disability insurance benefits.  Parra, 481 F.3d at 746.  Once this prima facie case is

19 established by the claimant, the burden shifts to the Commissioner to show that the claimant

20 may perform other gainful activity.  Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir.

21 2006).

22 **B.**    **Plaintiff's Mental Limitations**

23        Plaintiff asserts that the ALJ failed to properly consider the consultative psychological

24 evaluation of plaintiff performed by Harrell Reznick, Ph.D.  Specifically, plaintiff argues that the

25 ALJ failed to properly indicate whether he accepted the mental limitations that Dr. Reznick

26 found.  (See Joint Stipulation at 3-4, 6).  Defendant argues that Dr. Reznick found that plaintiff

27 had no medically determinable mental impairment and assessed no mental functional

28 limitations.  Defendant further argues that the ALJ implicitly accepted Dr. Reznick's opinion in

1  determining plaintiff's residual functional capacity.  (See Joint Stipulation at 4-6).

2      Dr. Reznick submitted a summary report of a psychological evaluation of plaintiff, dated

3  October 23, 2006.  (AR at 310-16).  Among his general observations, Dr. Reznick noted that

4  plaintiff "presented with what appeared to be a sub-optimal effort throughout this evaluation,

5  resulting in test performances that seem to underestimate her actual levels of functioning."  (AR

6  at 310).  Dr. Reznick noted that plaintiff reported that she had a seizure disorder that began in

7  November 2003, when she had two brain tumors excised, and, as a result, she experienced

8  routine lapses in attention, concentration, and memory.  (AR at 311).  Plaintiff also reported that

9  she experienced panic attacks, "often, when I try to sleep," obsessive-compulsive processes

10 regarding eating and food, and visual and auditory hallucinations, in the form of seeing "things

11 moving," and hearing ringing in her ears and voices talking to her.  (Id.).  Dr. Reznick noted,

12 however, that plaintiff did not present with any discernible psychotic processes during the

13 evaluation.  (Id.).  Further, although plaintiff reported feelings of depression with recurrent

14 suicidal ideation, she reported no history of actual suicide attempts.[2]  (Id.).  Plaintiff also

15 reported impaired sleep patterns, with initial insomnia and multiple awakenings throughout the

16 night, but denied any loss of appetite.  (Id.).  Dr. Reznick also noted that, according to plaintiff,

17 she was unable to perform even simple household chores, she could only cook simple meals

18 independently, she was able to run errands independently, but could not go shopping alone with

19 more complex lists of items.  (AR at 312).  She also reported that she could perform all self-care

20 activities independently, such as dressing and bathing herself, and could handle her own

21 financial affairs without assistance.  (AR at 313).

22     With respect to plaintiff's mental status examination, Dr. Reznick observed that plaintiff

23 was oriented in all dimensions, spoke clearly and was able to understand test instructions and

24 interview questions without difficulty, appeared neither hyperactive nor distractible, exhibited

25

26 [2] Dr. Reznick also noted that plaintiff reported that she participated in outpatient mental health
   interventions in 1980 and was depressed at that time.  (AR at 311).  Plaintiff participated in the programs
27 for about a year and was prescribed Zoloft, an anti-depressant medication.  Plaintiff reported that she
   took Zoloft for about a year, but had not taken any psychotropic medications in the last 25 years.  She
28 also denied any history of psychiatric hospitalizations.  (Id.).

1   normal mood and affect, with no evidence of thought disturbance, displayed adequate

2   commonsense judgment for her age or for the general population, and presented with an intact

3   fund of information for the general population. (AR at 313). Dr. Reznick noted again, however,

4   that plaintiff "appeared to exert a sub-optimal effort throughout the evaluation." (Id.). The

5   results of plaintiff's mental status examination indicated that she was able to state and spell her

6   first and last names; she knew the current date, but purportedly did not know the current day

7   of the week; she purportedly did not know her age, but knew her birthday; she knew the name

8   of the current president of the United States, but allegedly did not know the name of the

9   previous president; she was able to count backward from 20 to 1; she calculated serial three

10  additions from 3 to 30 without error and knew all the letters of the alphabet in the correct

11  sequence; her verbal abstraction was reportedly marginal;[3] and she ostensibly could not spell

12  the word "world" backwards and claimed to recall only two out of three designated objects in

13  the examination room after an interval of only five minutes. (AR at 314).

14       Dr. Reznick performed Trial II of the Test of Memory Malingering and found that plaintiff

15  scored 34 out of 50, which was below the cutoff score of less than 45, which was "suggestive

16  of malingering, and consequently, indicate[d] a high probability of malingering." (Id.).

17       Dr. Reznick also administered the Bender Visual-Motor Gestalt II test and noted that

18  plaintiff scored a 96, which was within the average range of current visual-motor functioning for

19  plaintiff's age group. (Id.). Dr. Reznick noted, however, that, given evidence that plaintiff

20  exerted a sub-optimal effort elsewhere during the examination, her standard score of 96 "should

21  be construed as a minimal valid estimate of [plaintiff's] actual levels of visual-motor

22  integration[.]" (Id.). The results of the "Trailmaking Test, Parts A and B" suggested a sub-

23  optimal effort rather than neuropsychological impairment.[4] (Id.). The results of plaintiff's IQ

24  ────────────────

25       [3] As an example, Dr. Reznick noted that plaintiff knew that an orange and a banana are alike, but

26  interpreted proverbs concretely. (AR at 314).

27       [4] Dr. Reznick noted that plaintiff "completed Part A in slow 58 seconds with one error. Part B was
    discontinued after 60 seconds, during which [plaintiff] committed 4 errors while professing progressive

28  confusion. In addition, [plaintiff] had only committed a small fraction of this part of the Trailmaking test."
                                                                                              (continued...)

1   tests (Wechsler Adult Intelligence Scale-III ("WAIS-III")) showed that plaintiff's verbal IQ was

2   72 (borderline range), her performance IQ was 69 (mildly mentally retarded range), and her full

3   scale IQ was 68 (mildly mentally retarded range).  (AR at 315).  Dr. Reznick noted, however,

4   that plaintiff displayed at least average language facility, including intact verbal comprehension

5   and an ability to carry on normal conversation with him.  Plaintiff was also able to provide a

6   detailed and coherent history during her subsequent interview.  Dr. Reznick stated, "These

7   capabilities suggest significantly higher intellectual functioning" than indicated by her IQ

8   estimates.  (Id.).  Dr. Reznick also noted that the results of plaintiff's test for memory (Wechsler

9   Memory Scale-III ("WMS-III")) were "spuriously low" and appeared "inconsistent with [plaintiff's]

10  ability to recall multiple specific details in her history."  (Id.).

11          Given plaintiff's test results and the clinical data, Dr. Reznick determined that plaintiff had

12  no diagnosable mental impairment.  (AR at 316).  Dr. Reznick concluded his summary report

13  with the following functional assessment:

14              [Plaintiff] can perform simple and repetitive tasks with minimal

15              supervision and is able to perform these tasks with appropriate

16              persistence and pace over a normal work cycle.  She is able to

17              understand, remember and carry out at least simple to moderately

18              complex verbal instructions without difficulty.  She can tolerate

19              ordinary work pressures and is able to interact satisfactorily with

20              others in the workplace, including the general public.  She can

21              observe basic work and safety standards in the workplace without

22              difficulty.  She is also capable of handling her own financial affairs

23              independently.

24  (Id.).

25          In his decision, the ALJ summarized the results of Dr. Reznick's psychological evaluation

26  and his opinion regarding plaintiff's functional capabilities, and noted that the medical evidence

27  _____

28      [4](...continued)
(AR at 314).

1   in the record supported a finding that plaintiff "has no medically determinable mental impairment

2   that cause[s] more than minimal limitations."[5]  (AR at 15-16).  The ALJ concluded that plaintiff's

3   headaches, neck pain, history of seizure disorder, urinary incontinence and hypertension

4   constituted severe impairments, but that plaintiff did not have a medically determinable mental

5   impairment.  (AR at 16).  The ALJ ultimately determined that plaintiff retained the physical

6   residual functional capacity to perform medium work and, specifically, was capable of lifting and

7   carrying 50 pounds occasionally and 25 pounds frequently, and sitting, standing and walking

8   for six hours in an eight-hour day, but could not perform any overhead reaching bilaterally and

9   should avoid hazards such as heights and machinery.  (AR at 16-17).

10          Here, plaintiff does not argue that the ALJ erred in determining that she had no medically

11  determinable mental impairment.  Rather, plaintiff argues only that the ALJ offered no statement

12  as to whether he accepted or rejected the limitations Dr. Reznick imposed on plaintiff,

13  specifically, that she could perform simple and repetitive tasks with minimal supervision, she

14  was able to perform these tasks with appropriate persistence and pace over a normal work

15  cycle, and remained capable of understanding, remembering, and carrying out at least simple

16  to moderately complex verbal instructions without difficulty.  (Joint Stipulation at 3-4).  To the

17  extent the ALJ rejected Dr. Reznick's opinion regarding plaintiff's limitations, plaintiff asserts

18  that the ALJ failed to provide specific and legitimate reasons, supported by substantial

19  evidence, for rejecting his opinion.  (Joint Stipulation at 3-4).  Defendant argues that, rather than

20  describing plaintiff's mental functional limitations, Dr. Reznick described only the _least_ that

21  _____

22      [5]  During the December 4, 2007 hearing, although plaintiff indicated that she had some memory
    problems, problems focusing and concentrating, and had depression (see AR at 32, 33, 34, 35, 43; see

23  also AR at 116, 138, 142, 145, 146, 150, 160, 228, 290, 340-44), as noted by defendant, the record is
    not inconsistent with the absence of a mental impairment.  (See Joint Stipulation at 5).  The record does

24  not indicate that plaintiff had been diagnosed by any treating source with a mental impairment or mental
    functional limitations, and Dr. Reznick and a State Agency medical consultant found no mental

25  impairment.  (See AR at 153, 201, 316, 317, 327).  Indeed, plaintiff testified at the hearing, and the ALJ
    noted, that she had not received any mental health treatment "lately" and was not taking any mental

26  health medication at that time.  (AR at 18, 43-44).  Additionally, during Dr. Reznick's psychological
    evaluation, plaintiff reported that she had participated in outpatient mental health interventions in 1980

27  for about a year and was depressed at that time because she "had a bad marriage and divorce," and
    had been prescribed the anti-depressant Zoloft, but reported that she had not taken any psychotropic

28  medications in the last 25 years and denied any history of psychiatric hospitalizations.  (AR at 311).

1   plaintiff could do and the ALJ's residual functional capacity determination indicates that he
2   impliedly accepted Dr. Reznick's opinion.  (Joint Stipulation at 4-6).
3       The Court concurs with defendant.  Dr. Reznick did not diagnose plaintiff with any mental
4   impairment.  He noted several times in his summary report that plaintiff exerted a sub-optimal
5   effort throughout the evaluation, which he opined resulted in test performances that
6   underestimated her actual levels of functioning, and specifically found that plaintiff's scores for
7   the Test of Memory Malingering "indicate[d] a high probability of malingering."  (See AR at 310,
8   313, 314).  He stated that plaintiff's score with regard to the Bender Visual-Motor Gestalt II test
9   should be construed as a minimum estimate of her actual levels of visual-motor integration, the
10  results of the "Trailmaking Test, Parts A and B" suggested a sub-optimal effort rather than
11  neuropsychological impairment and, given that plaintiff's language facility was at least average
12  and she was able to provide a detailed, coherent history during the examination, plaintiff had
13  significantly higher intellectual functioning that her IQ estimates indicated.  (AR at 314, 315).
14  The results of plaintiff's test for memory was also "spuriously low" and were inconsistent with
15  her ability to recall specific details in her history.  (AR at 315).  Considering Dr. Reznick's
16  summary report as a whole, his functional assessment was clearly a statement of plaintiff's
17  minimum mental functional capabilities in light of her sub-optimal effort throughout the
18  evaluation and high probability of malingering, and not his opinion of her functional limitations.
19  (See AR at 316).  Cf. Robbins, 466 F.3d at 882 ("If the evidence can support either affirming
20  or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ.");
21  Magallanes, 881 F.2d at 750 (ALJ's decision must be upheld where the evidence is susceptible
22  to more than one rational interpretation).
23      Moreover, the ALJ may rely upon the opinion of a consultative examiner, such as Dr.
24  Reznick, in order to determine a claimant's residual functional capacity if the opinion is
25  supported by clinical tests and observations upon examination.  See Tonapetyan v. Halter, 242
26  F.3d 1144, 1149 (9th Cir. 2001) (examining physician's opinion may constitute substantial
27  evidence when based on independent clinical findings and examination); Andrews v. Shalala,
28  53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ is charged with determining a claimant's residual

1  functional capacity based on an evaluation of the evidence as a whole, see 20 C.F.R. §§
2  404.1546, 416.945; Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989), and an ALJ may
3  reject all or part of an examining physician's report if it contains inconsistencies, is conclusory,
4  or inadequately supported by clinical findings.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir.
5  2002).

6           In his decision, the ALJ implicitly relied on Dr. Reznick's findings regarding plaintiff's
7  minimum functional capabilities in concluding that plaintiff had no medically determinable
8  mental impairment that caused more than minimal functional limitations.  (See AR at 16).  The
9  ALJ's reliance on Dr. Reznick's findings is also evident in his assessment of plaintiff's residual
10  functional capacity, in that mental functional restrictions are entirely absent from the
11  assessment.  (See AR at 16-17).  The ALJ's residual functional capacity assessment is not
12  contrary to Dr. Reznick's mental functional assessment given that Dr. Reznick described the
13  least plaintiff could perform.  Thus, the Court concludes that the ALJ did not err in his
14  consideration of Dr. Reznick's opinion, and any error in omitting an explicit statement that he
15  adopted Dr. Reznick's functional assessment was harmless and, thus, cannot serve as the
16  basis for remand.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (a decision of the
17  ALJ will not be reversed for errors that are harmless); see also Stout v. Comm'r, 454 F.3d 1050,
18  1055 (9th Cir. 2006) (harmless error occurs where alleged mistake is nonprejudicial to
19  claimant).

20  **C.    The Hypothetical Question Posed to the Vocational Expert**

21           Plaintiff argues that the ALJ failed to pose a complete hypothetical to the vocational
22  expert at the December 4, 2007 hearing.  Citing to Dr. Reznick's functional assessment, plaintiff
23  argues that the ALJ failed to incorporate into his hypothetical the limitations that plaintiff could
24  perform simple and repetitive tasks with only minimal supervision and with appropriate
25  persistence and pace over a normal work cycle, and was able to understand, remember and
26  carry out at least simple to moderately complex verbal instructions without difficulty.  (See Joint
27  Stipulation at 6-7; AR at 316).  Thus, plaintiff argues that the ALJ's omission of these limitations
28  from the hypothetical question prevented the vocational expert from properly assessing whether

1 plaintiff could perform and sustain full time competitive work and, due to her "significant

2 limitations," the vocational base is likely to be diminished entirely. (See Joint Stipulation at 7,

3 8).

4          In order for the vocational expert's response to a hypothetical question to constitute

5 substantial evidence, the hypothetical must be based on medical assumptions supported by

6 substantial evidence in the record that reflect each of the claimant's limitations. Andrews v.

7 Shalala, 53 F.3d 1035, 1044 (9th Cir. 1995); Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir.

8 1995). The hypothetical should be "accurate, detailed and supported by the medical record."

9 Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). The ALJ "is free to accept or reject

10 restrictions in a hypothetical question that are not supported by substantial evidence." Greger

11 v. Barnhart, 464 F.3d 968, 973 (9th Cir. 2006) (citing Osenbrock v. Apfel, 240 F.3d 1157, 1164-

12 65 (9th Cir. 2001)).

13          As discussed in Section B, supra, Dr. Reznick's functional assessment was a statement

14 of plaintiff's minimum mental functional capabilities, not her functional limitations. (See AR at

15 316). Plaintiff does not cite to any other medical evidence suggesting that she had mental

16 functional limitations that interfered with her ability to do basic work activity. Thus, the omission

17 of plaintiff's assessed minimum capabilities from the hypothetical posed to the vocational expert

18 does not constitute error. See Andrews, 53 F.3d at 1044 (ALJ's hypothetical must consider all

19 of the claimant's limitations); Magallanes, 881 F.2d at 756-57 (an ALJ need only include

20 limitations that are supported by substantial evidence in the record). Because the hypothetical

21 included the limitations that the ALJ found credible and supported by substantial evidence in

22 the record, the ALJ properly relied on the testimony of the vocational expert in response to the

23 hypothetical as substantial evidence in making the disability determination.

24 **D.    Plaintiff's Past Relevant Work**

25          Plaintiff argues that the ALJ erred in determining that she is capable of performing her

26 past relevant work as a change person, income tax preparer, fast food worker, attendance

27 clerk, and a general office clerk. (See Joint Stipulation at 8-11, 14).

28 ///

1    In support of his conclusion that plaintiff is capable of performing her past work, the ALJ

2    summarized the vocational expert's testimony classifying plaintiff's past relevant work

3    experience pursuant to the Dictionary of Occupational Titles ("DOT").  (AR at 18-19).  The ALJ

4    noted that plaintiff's past work as an office clerk, routine (Clerk, General, DOT No. 209.562-010,

5    available at 1991 WL 671792) was light[6] and semi-skilled (sedentary as performed) with a

6    Specific Vocational Preparation ("SVP")[7] of three; change person (Change Person, DOT No.

7    211.467-034, available at 1991 WL 671854) was medium[8] and unskilled with a SVP of

8    _____

9    [6]  The DOT assigns each occupation that it chronicles a Physical Demands Strength Rating which
     reflects the estimated overall strength requirement of the job which are considered to be important for
10   average, successful work performance.  The DOT defines light work as follows:

11        Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds
          of force frequently, and/or a negligible amount of force constantly
12        (Constantly: activity or condition exists 2/3 or more of the time) to move
          objects.  Physical demand requirements are in excess of those for
13        Sedentary Work.  Even though the weight lifted may be only a negligible
          amount, a job should be rated Light Work:  (1) when it requires walking
14        or standing to a significant degree; or (2) when it requires sitting most of
          the time but entails pushing and/or pulling of arm or leg controls; and/or
15        (3) when the job requires working at a production rate pace entailing the
          constant pushing and/or pulling of materials even though the weight of
16        those materials is negligible.

17   Dictionary of Occupational Titles, Appendix C; see also 1991 WL 671792. Sedentary work is defined
18   as:

19        Exerting up to 10 pounds of force occasionally (Occasionally: activity or
          condition exists up to 1/3 of the time) and/or a negligible amount of force
20        frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the
          time) to lift, carry, push, pull, or otherwise move objects, including the
21        human body.  Sedentary work involves sitting most of the time, but may
          involve walking or standing for brief periods of time.  Jobs are sedentary
22        if walking and standing are required only occasionally and all other
          sedentary criteria are met.
23

24   Dictionary of Occupational Titles, Appendix C.

25   [7]  SVP is defined as the amount of lapsed time required by a typical worker to learn the techniques,
     acquire the information, and develop the facility needed for average performance in a specific job-worker
26   situation.  A level three SVP indicates that over one month, up to and including three months, is the
     amount of time necessary for a typical worker to become accustomed to the special conditions of the
27   new job.  Dictionary of Occupational Titles, Appendix C; see also 1991 WL 671792.

28   [8]  The DOT defines medium work as follows:

(continued...)

two[9]; income tax preparer (Tax Preparer, DOT No. 219.362-070, available at 1991 WL 671965),

was sedentary and semi-skilled with a SVP of four[10]; fast food worker (Fast-Foods Worker, DOT

No. 311.472-010, available at 1991 WL 672682) was light and unskilled with a SVP of two;

attendance clerk (Attendance Clerk, DOT No. 219.362-014, available at 1991 WL 671954) was

sedentary and skilled with a SVP of six[11]; and clerk, office general (Administrative Clerk, DOT

No. 219.362-010, available at 1991 WL 671953) was light and semi-skilled with a SVP of four.

(AR at 18-19; see AR at 45-46).  The ALJ noted that the vocational expert testified that these

work activities do not require the performance of work-related activities precluded by plaintiff's

residual functional capacity and concluded:

> In comparing [plaintiff's] residual functional capacity with the
> physical and mental demands of these work activities, the
>
> undersigned finds that [plaintiff] is able to perform all of her past
> work activities as they were actually and generally performed.

(AR at 19).

Plaintiff now argues that the requirements of her past work activities exceed the

limitations assessed by Dr. Reznick because they do not entail simple, repetitive tasks and they

---

[8](...continued)
> Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds
> of force frequently, and/or greater than negligible up to 10 pounds of
> force constantly to move objects.  Physical Demand requirements are in
> excess of those for Light Work.

Dictionary of Occupational Titles, Appendix C; see also 1991 WL 671854.

[9] A level two SVP indicates that anything beyond short demonstration, up to and including 1 month, is the amount of time necessary for a typical worker to become accustomed to the special conditions of the new job.  Dictionary of Occupational Titles, Appendix C; see also 1991 WL 671854.

[10] A level four SVP indicates that over 3 months, up to and including 6 months, is the amount of time necessary for a typical worker to become accustomed to the special conditions of the new job. Dictionary of Occupational Titles, Appendix C; see also 1991 WL 1991 WL 671965.

[11] A level six SVP indicates that over 1 year, up to and including 2 years, is the amount of time necessary for a typical worker to become accustomed to the special conditions of the new job. Dictionary of Occupational Titles, Appendix C; see also 1991 WL 671954.

1 | require dealing with people and attaining precise set limits, tolerances, and standards. (Joint

2 | Stipulation at 10). Plaintiff argues that the limitations assessed by Dr. Reznick and the ALJ's

3 | determination that plaintiff could perform her past work conflict with the reasoning levels

4 | required by her past work activities, as set forth in the DOT. (See Joint Stipulation at 10-11).

5 | Again, as previously discussed, Dr. Reznick did not assess any functional limitations, but,

6 | rather, described plaintiff's minimum mental functional capabilities. (See AR at 316). See supra

7 | Section B. Thus, to the extent plaintiff argues that Dr. Reznick assessed limitations on plaintiff's

8 | mental functional abilities that conflict with the DOT requirements for her past work activities,

9 | plaintiff's argument fails. Similarly, insofar as plaintiff argues that the ALJ's assessed residual

10 | functional capacity, which contains no mental functional limitations, conflicts with the

11 | requirements of her past relevant work, this argument also fails. The ALJ properly relied on the

12 | vocational expert's testimony in concluding that plaintiff could perform her past relevant work.

13 | Moreover, even if the Court construed Dr. Reznick's functional assessment as a

14 | statement of her mental functional limitations rather than her minimum abilities, and found that

15 | plaintiff was limited to performing simple and repetitive tasks, the limitation would not prevent

16 | plaintiff from performing all of her past relevant work. (See Joint Stipulation at 11-14). The

17 | vocational expert opined, and the ALJ concluded, that plaintiff could perform the occupations

18 | of change person and fast food worker, which both required reasoning level two. (See AR at

19 | 18, 46). See 1991 WL 671854; 1991 WL 672682. Reasoning level two is defined as the ability

20 | to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral

21 | instructions" and "[d]eal with problems involving a few concrete variables in or from

22 | standardized situations." Dictionary of Occupational Titles, Fourth Edition, 1991, Appendix C.

23 | Performing simple and repetitive tasks is not inconsistent with the job requirements of change

24 | person and fast food worker as the DOT defines these jobs. Indeed, the ability to perform

25 | simple and repetitive tasks is consistent with reasoning level two. See Hackett v. Barnhart, 395

26 | F.3d 1168, 1176 (10th Cir. 2005) (stating that reasoning level two appears more consistent with

27 | the capacity to perform "simple and routine work tasks"); Meissl v. Barnhart, 403 F. Supp. 2d

28 | 981, 983-85 (C.D. Cal. 2005) (holding that reasoning level two jobs are consistent with the

1  ALJ's limitation to simple, repetitive tasks); <u>Flaherty v. Halter</u>, 182 F. Supp. 2d 824, 850-51 (D.

2  Minn. 2001) (holding that DOT's reasoning level two requirement did not conflict with the ALJ's

3  limitation to "simple, routine, repetitive, concrete, tangible tasks").[12]  Further, the requirement

4  that plaintiff be able to carry out instructions that are "detailed but uninvolved" to perform

5  reasoning level two jobs would not change this conclusion.  See <u>Meissl</u>, 403 F. Supp. 2d at 984-

6  85 ("Although the DOT definition does state that the job requires the understanding to carry out

7  detailed instructions, it specifically caveats that the instructions would be uninvolved - that is,

8  not a high level of reasoning." (citing <u>Flaherty</u>, 182 F. Supp. 2d at 850)).  Thus, even if plaintiff

9  was limited to performing simple and repetitive tasks, a determination that she could perform

10  her past work as a change person and a fast food worker would not contradict the DOT's

11  descriptions of those occupations.  Plaintiff has failed to satisfy her burden of showing that she

12  can no longer perform her past relevant work.  See <u>Pinto</u>, 249 F.3d at 844; <u>see also</u> 20 C.F.R.

13  §§ 404.1520(f), 416.920(f) ("If you can still do [your past relevant work], we will find that you are

14  not disabled.").

15  **E.   <u>The Side Effects of Plaintiff's Medications</u>**

16          Plaintiff argues that the ALJ failed to properly consider the type, dosage, effectiveness,

17  and side effects of her medication.  (<u>See</u> Joint Stipulation at 14-15).  In a function report

18  completed by plaintiff on November 4, 2006, plaintiff stated that she wakes up in the morning,

19  eats breakfast when she is hungry, takes medication and "wait[s] to get past some side effect."

20  _____

21          [12]  <u>See also</u> <u>Hine v. Astrue</u>, 2008 WL 4813883, at *4 (C.D. Cal. Nov. 3, 2008) (rejecting plaintiff's
   argument that reasoning level two requirements conflicted with her restriction to simple, repetitive work,

22  as well as her moderate limitation in her ability to understand, remember, and carry out detailed
   instructions, and stating that, "[w]here there is a finding . . . that a claimant can perform simple tasks with

23  'some element of repetitiveness to them,' then [Reasoning] Level 1 on the DOT scale requires slightly
   less than this level of reasoning.  Moreover, although Level 2 reasoning references an ability to follow

24  'detailed' instructions, it qualifies and 'downplay[s] the rigorousness of those instructions by labeling
   them as 'uninvolved.'  Accordingly, the DOT's use of the term 'detailed' in describing Level 2 reasoning

25  does not render it inconsistent with a limitation to simple, repetitive tasks." (citations and some internal
   quotations omitted)); <u>Salazar v. Astrue</u>, 2008 WL 4370056, at *7-8 (C.D. Cal. Sept. 23, 2008) (rejecting

26  argument that limitation to simple, repetitive tasks is inconsistent with level 2 reasoning ability); <u>Squier</u>
   <u>v. Astrue</u>, 2008 WL 2537129, at *5 (C.D. Cal. June 24, 2008) (stating that "[p]laintiff's limitation to simple,

27  repetitive tasks is not inconsistent with the ability to perform jobs with a reasoning level of two" and
   concluding that substantial evidence supported the ALJ's determination that plaintiff could perform a

28  significant number of jobs in the regional or national economy).

1  (AR at 145).  Plaintiff also claimed in a disability report that Adalat made her "dizzy" and Dilantin
2  made her "sleepy."  (See AR at 120; see also AR at 163, 178).  Further, in a pain questionnaire
3  dated August 31, 2006, plaintiff claimed that Tramadol, which she took for her neck and
4  shoulder pain, made her "sleepy."  (See AR at 123-24).

5       An ALJ must consider all factors that might have a significant impact on an individual's
6  ability to work.  See Erickson v. Shalala, 9 F.3d 813, 817 (9th Cir. 1993) (quoting Varney v.
7  Sec'y, 846 F.2d 581, 585 (9th Cir. 1987), modified by 859 F.2d 1396 (9th Cir. 1988)).  These
8  factors may include side effects of medication.  Erickson, 9 F.3d at 818; see Varney, 846 F.2d
9  at 585 ("Like pain, the side effects of medications can have a significant impact on an
10  individual's ability to work and should figure in the disability determination process.  Also like
11  pain, side effects can be a 'highly idiosyncratic phenomenon' and a claimant's testimony as to
12  their limiting effects should not be trivialized." (citations omitted)); see also Social Security
13  Ruling ("SSR")[13] 96-8p (side effects of medications are a factor to be considered in the
14  formulation of a claimant's residual functional capacity); SSR 96-7p (side effects of medications
15  are a factor to be considered in assessing a claimant's credibility); Lingenfelter v. Astrue, 504
16  F.3d 1028, 1040 (9th Cir. 2007) (the Social Security Administration requires ALJs to consider
17  all the evidence in the case record in assessing a claimant's subjective pain and symptom
18  testimony, including side effects of any medications).  When a plaintiff testifies about
19  experiencing a known side effect associated with a particular medication, the ALJ may
20  disregard the testimony only if he "support[s] that decision with specific findings similar to those
21  required for excess pain testimony."  Varney, 846 F.2d at 585.  Moreover, side effects that are
22  not "severe enough to affect [a plaintiff's] ability to work" are properly excluded from
23  consideration.  See Osenbrock, 240 F.3d at 1164 (medical records included passing mentions
24  of side effects of medication, but there was no evidence of side effects severe enough to
25  interfere with plaintiff's ability to work).  Ultimately, a plaintiff bears the burden of demonstrating

26
27  [13] Social Security Rulings are issued by the Commissioner to clarify the Commissioner's regulations
   and policies.  Bunnell v. Sullivan, 947 F.2d 341, 346 n.3 (9th Cir. 1991) (en banc).  Although they do not
28  have the force of law, they are, nevertheless given deference "unless they are plainly erroneous or
   inconsistent with the Act or regulations."  Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

1  that any claimed side effects from medication are severe enough to interfere with her ability to

2  work.  See Miller v. Heckler, 770 F.2d 845, 849 (9th Cir. 1985) (plaintiff failed to meet burden

3  of proving medication impaired his ability to work because he produced no clinical evidence);

4  see also Osenbrock, 240 F.3d at 1164.

5       Here, in determining that plaintiff's statements concerning the intensity, persistence and

6  limiting effects of her alleged symptoms were not entirely credible, the ALJ noted that plaintiff

7  did not report any adverse side effects from any prescribed medication.  (See AR at 18).  Cf.

8  Johnson v. Shalala, 60 F.3d 1428, 1433-34 (9th Cir. 1995) (finding that ALJ properly discounted

9  claimant's testimony of excess pain as not credible where, inter alia, ALJ pointed out the conflict

10  between claimant's testimony that pain and medication interfered with her ability to think and

11  the fact that she failed to tell her doctor of any mental limitations resulting from her condition);

12  Eicholtz v. Astrue, 2008 WL 4642976, at *3 (C.D. Cal. Oct. 20, 2008) (stating that "an ALJ may

13  discount a claimant's credibility based on failure to tell a doctor of the limitations" (citing

14  Johnson, 60 F.3d at 1434)).  Plaintiff has not produced any objective evidence of her side

15  effects, and there is no evidence in the record indicating that she complained to any treating or

16  evaluating source of alleged side effects from her medication or that her purported side effects

17  resulted in any functional limitation that affected her ability to work.[14]  See Osenbrock, 240 F.3d

18  at 1164 (ALJ did not err in excluding side effects because although "[t]here were passing

19  mentions of the side effects of [the claimant's] medication in some of the medical records, [ ]

20  there was no evidence of side effects severe enough to interfere with [his] ability to work");

21  Miller, 770 at 849 (plaintiff failed to meet burden of proving medication impaired his ability to

22  work because he produced no clinical evidence); see also Parra, 481 F.3d at 746 (the burden

23  is on the claimant to establish his or her entitlement to benefits).  Indeed, at the December 4,

24  2007 hearing, plaintiff did not mention or discuss any side affects she allegedly suffered from

25  her medications, much less claim that she was unable to work due to side effects.  (See AR at

[14]  (See, e.g., AR at 188, 199, 200-01, 202, 203, 214, 226, 227, 228, 229, 239, 244, 248, 258, 261, 272, 273, 282, 290, 311, 340-44).

30-44).  Thus, plaintiff failed to meet her burden of showing that the purported side effects of her medications impaired her ability to work, and the ALJ committed no material error in his consideration of plaintiff's medication and the purported side effects thereof.  Cf. Burch, 400 F.3d at 679 (a decision of the ALJ will not be reversed for errors that are harmless).

## ORDER

After careful consideration of all documents filed in this matter, this Court finds that the decision of the Commissioner is supported by substantial evidence and that the Commissioner applied the proper legal standards.  The Court, therefore, AFFIRMS the decision of the Commissioner of Social Security Administration.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 31, 2009

_____/s/-Jennifer T. Lum_____
JENNIFER T. LUM
UNITED STATES MAGISTRATE JUDGE